UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| ANDREW GREGORY SPOTTED ELK, | 4:16-CV-04019-LLP |
| Plaintiff, | |
| vs. | ORDER |
| DR. BRAD ADAMS, Doctor at SDSP, in his individual capacity; and DR. EUGENE REGIER, Doctor at SDSP, in his individual capacity; | |
| Defendants. | |

Plaintiff, Andrew Gregory Spotted Elk, filed this pro se lawsuit pursuant to 42 U.S.C. § 1983. Defendants filed a motion for summary judgment (Docket 28) contending that summary judgment should be granted based on qualified immunity. Spotted Elk thereafter filed motions to appoint counsel (Docket 38 and 40) but did not respond to the defendants' motion for summary judgment. Having considered the written record in this case and for the reasons set forth below, the defendants' motion for summary judgment will be granted based upon qualified immunity.

## FACTUAL BACKGROUND

The local rules for this district require that the moving party on a motion for summary judgment submit a statement of the material facts as to which it contends there is no genuine issue to be tried. D.S.D. CIV. LR 56.1(A). The opposing party is required to respond to each numbered paragraph in the moving party's statement of material facts, and to identify any material facts as to which it contends there exists a genuine material issue to be tried. D.S.D.

CIV. LR 56.1(B). All material facts set forth in the moving party's statement of material facts are deemed admitted if not controverted by the statement required to be served by the party opposing summary judgment. D.S.D. CIV. LR 56.1(D); see also *On Target Sporting Goods, Inc. v. Attorney General of the United States*, 472 F.3d 572, 574 (8th Cir. 2007); see also *Northwest Bank & Trust Co. v. First Illinois Nat'l Bank*, 354 F.3d 721, 724–25 (8th Cir. 2003) (holding it was not an abuse of discretion to deem that plaintiff had admitted all of defendants' statements of material facts as a sanction for noncompliance with local summary judgment rules). Such rules are properly intended "to prevent a district court from engaging in the proverbial search for a needle in the haystack." *Libel v. Adventure Lands of America, Inc.*, 482 F.3d 1028, 1032 (8th Cir. 2007) (discussing a similar Iowa Local Rule); see also *Huckins v. Hollingsworth*, 138 Fed. Appx. 860, 862 (8th Cir. 2005) (affirming district court's application of D.S.D. CIV. LR 56.1 "even though those rules prevented it from considering some facts improperly alleged by [Plaintiffs] that might have been relevant to the summary judgment motion").

"Although pro se pleadings are to be construed liberally, pro se litigants are not excused from failing to comply with substantive and procedural law." *Burgs v. Sissel*, 745 F.2d 526, 528 (8th Cir. 1984) (citing *Faretta v. California*, 422 U.S. 806, 834-35 n. 46 (1975)). Additionally, a district court has no obligation to "plumb the record in order to find a genuine issue of material fact." *Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 260 (8th Cir. 1996). Nor is the court "required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Id.* Summary judgment could be

granted without further analysis, because a party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e).

The defendants filed a Statement of Undisputed Facts (Docket 163) along with supporting affidavits and exhibits. The defendants' undisputed facts are recited below:

1. Plaintiff, Andrew Spotted Elk, is an inmate currently incarcerated at the South Dakota State Penitentiary (SDSP) in Sioux Falls, South Dakota. Docket 7 at 29. On or about July 15, 2014, Spotted Elk pled guilty to Aggravated Assault in violation of SDCL 22-18-1(2). Subsequent thereto, on or about December 10, 2014, Spotted Elk was sentenced to serve fifteen (15) years in the SDSP. Docket 21 at 113.

2. The injuries which now form the basis for Spotted Elk's current complaint occurred prior to his incarceration at the SDSP. Dockets 31 ¶ 4; 29-11; 19-57. When seen by Health Services at the SDSP on December 3, 2015, Spotted Elk indicated that he injured his lower back when he "jumped off a trailer and landed wrong." Dockets 31 ¶ 4-5; 29-11; 29-57. According to Spotted Elk, he suffered severed tendons and nerves in his right arm from a "deep laceration."

3. On December 9, 2015, Spotted Elk told Health Services that he suffered a "significant laceration to right inter forearm" when he "fell through a window - 2002-2003." Dockets 31 ¶ 5; 29-36; 29-57. As for the injury to his back, Spotted Elk again indicated that he "jumped off a trailer (house) landed on legs and went to IHS." According to Spotted Elk, he was "cleared with no fractures" and "no x-rays performed." Docket 29-57.

4.     Defendant Eugene Regier is a licensed physician authorized to practice medicine in the State of South Dakota since on or about June 1965. Docket 31 ¶ 1. Dr. Regier has been providing medical services to inmates incarcerated at the SDSP since on or about June 1996. Docket 31 ¶ 2. He became an employee of the South Dakota Department of Health (SDDOH) in May 2001 when said agency undertook the responsibility of providing medical care of inmates incarcerated in the State's correctional facilities. Docket 31 ¶ 2.

5.     In Count 1 of his Complaint, Spotted Elk alleges that Defendant Regier "willingly supports Dr. Adams in his malpractice and stands firm in supporting his action not to place me back on the medication I was taken off due to reason unknown." Docket 7 at 32. According to Spotted Elk, Dr. Regier is "allowing me as well to suffer from the chronic arm and back pain by his unwillingness to adjust or manage my pain medication."

6.     Spotted Elk, in Count 2 of his Complaint, alleges that "due to a Incident Report which was dismissed the two individuals [Regier/Adams] above will not provide any care to me related to the area the write up was issued." Docket 7 at 33. It is alleged that "DOC officials had stated to these individuals that the write up is nonexistent and that they cannot refer to it or use it against me but Dr. Adams and Dr. Regier continue to."

7.     Finally, Spotted Elk contends, in Count 3 of his Complaint, that "these individuals continue to exercise defamation of character by allowing the notes on my chart to state medication abuse which has affected the medical services I receive negatively." Docket 7 at 34.

8.     The Court, in an Order dated August 12, 2016, found that "to the extent that Spotted Elk raises a claim based on Defendant's failure to follow the policies of the South Dakota

4

Department of Corrections (SDDOC), it is dismissed." Docket 11 at 81. As found by the Court, "there is no § 1983 liability for violating prison policy." Gardner v. Howard, 109 F.3d 427, 430 (8th Cir. 1997).

9.      In regards to Spotted Elk's allegations that Defendants defamed him by stating that he abused medication in his medical file, the Court found that "this file . . . by its nature is not published." Docket 11 at 81-82. Thus, to the extent that Spotted Elk raises a claim for defamation, his claim is dismissed."

10.     It was said that "to the extent that Spotted Elk raises a claim of medical malpractice where a claim based on negligence, it is dismissed." Docket 11 at 80. According to the Court, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." McRaven v. Sanders, 577 F.3d 974, 982 (8th Cir. 2009).

11.     Although indicating that "it is true that a prisoner has no constitutional right to a particular course of treatment and claims based solely on a disagreement with the course of treatment do not rise to the level of a constitutional violation," the Court stated that "this is not a mere disagreement concerning treatment." Docket 11 at 80. The finding was based on Spotted Elk's claims/allegations that he was "denied medication completely."

**Denial of Medication**

12.     A review, however, of Spotted Elk's medical records reveals that there is absolutely no support whatsoever the allegations that Spotted Elk was "denied medication completely." Dockets 31 ¶ 22; 29-5; 29-6; 29-19; 29-27; 29-52; 29-53.

13.     Spotted Elk was initially prescribed Lyrica in response to his complaints of chronic back pain. Dockets 31 ¶ 6; 29-2. That medication, however, was later discontinued, on or

about October 21, 2015, after an Informational Report was written charging Spotted Elk for having committed Prohibited Act L-14 which prohibits the "misuse of prescribed or authorized medicine, including saving or accumulation of authorized medicine contrary to medical orders." Dockets 31 ¶ 6; 29-1; 29-2.

14.     It is indicated in said report, Officer Preston Perrett was conducting morning medication pass when he "observed Inmate Spotted Elk attempt to take his medication." Dockets 31 ¶ 7; 29-1. According to the report, the officer "observed Inmate Spotted Elk put his medication on the right side of his lower jaw."

15.     The officer therefore "instructed Inmate Spotted Elk to open his mouth so [he] could visibly see there was no medication." The record reflects that during the check, it "appeared the medication was still on the right side of his mouth." Dockets 31 ¶ 7; 29-1. Said report further states that "this is an ongoing issue with Inmate Spotted Elk."

16.     Lyrica is considered a "preferred drug" that is often sought after by inmates due to its perceived euphoric potential. Docket 31 ¶ 9. It is therefore a medication that can be and has been abused by inmates. As such, it is closely monitored by medical staff at the SDSP to insure that it is being properly used by those individuals to whom it has been prescribed. Docket 31 ¶ 10.

17.     The risks associated with abusing/misusing prescribed medications such as Lyrica includes serious, even life-threatening allergic reactions. Docket 31 ¶ 10. Abuse of this medication has also been said to lead to serious seizures which can require immediate hospitalization. Moreover, Lyrica is known to contain addictive properties and is thus considered very dangerous when abused. Docket 31 ¶ 10.

18.     In the opinion of medical staff at the SDSP, the health/safety risk associated with continuing to prescribe Lyrica for Spotted Elk, after there was reason to suspect that he was abusing the same, clearly outweighed any risk associated with discontinuing the use of that particular medication. Docket 31 ¶ 11 The risks associated with discontinuing Spotted Elk's prescription for Lyrica were considered by medical staff to be minimal given the various alternative medications that could be prescribed for his complaints of chronic back pain. Docket 31 ¶ 11.

19.     Based on the above, Health Services at the SDSP "called Brad Adams PAC" on the afternoon of October 21, 2015 to discuss said "write up." Dockets 31 ¶ 12; 29- 2. Staff "received verbal order over the phone" to "stop/discontinue . . . Lyrica 150 mg POTID after supper dose tonight."

20.     The record, however, reflects that medical staff were further instructed to "start Lyrica 150 mg capsules, 150 mg #6: take one capsule by mouth two times per day for three days." In addition thereto, Health Services were further directed to "start Lyrica 150 mg capsules, 150 mg #3: take one capsule by mouth one time per day for three days Dockets 31 ¶ 13; 29-2. Finally, Spotted Elk was prescribed "Lyrica 150 mg #3: take one capsule by mouth QOD x 5 days."

21.     When seen by Health Services at the SDSP on October 23, 2015, Spotted Elk complained that "medication for his back pain, Lyrica was being discontinued." Dockets 31 ¶ 14; 29-3. He told medical staff that "Informational was written, however, he has not been found guilty of this action." Spotted Elk, therefore, was "requesting his Lyrica to be renewed until DHO/UDC conclusion." Dockets 31 ¶ 14; 29-3.

22.    The provider, per "nursing note," undertook to "review chart" on October 23, 2015. As indicated in his medical records, "patient has had multiple issues with med abuse." Dockets 31 ¶ 15; 29-3. The decision was thus made by provider that Lyrica "will not be restarted."

23.    On October 29, 2015, Spotted Elk told Health Services that he "wants visit with provider about medication being renewed specific to Lyrica because write up was dismissed." Dockets 31 ¶ 19; 29-4. The record, however, reflects that "patient has documentation of cheeking medicine and this is not the first occurrence." Dockets 31 ¶ 19; 29-4. Spotted Elk, therefore, was again advised that "Lyrica will not be restarted."

24.    A review of Spotted Elk's medical records reflects that there is another entry/notation dated October 29, 2015, again indicating that "patient with documentation with cheeking Lyrica." Dockets 31 ¶ 20; 29-5. As indicated therein, "when medicine is abused and not taken as directed, it shows that patient does not need medication." Spotted Elk, therefore, was advised that he "can use Ibuprofen and Tylenol prn for pain." Dockets 31 ¶ 20; 29-5.

**Alternative Medications Prescribed**

25.    Spotted Elk later reported to Health Services on November 16, 2015 "wanting different pain medication." Dockets 31 ¶ 21; 29-6. It was, however, once again documented that provider "will not start Lyrica due to misuse."

26.    In response to Spotted Elk's request for "different pain medication," the provider elected to "start Gabapentin." Dockets 31 ¶ 21; 29-6. Spotted Elk was directed to "take one capsule by mouth three times a daily: breakfast, noon and supper." Dockets 31 ¶ 21; 29-7.

27.     Spotted Elk's medical records reflect that Gabapentin is considered a "somewhat similar medication" to Lyrica. Dockets 31 ¶ 23; 29-8. Both drugs are antiepileptic medication that are often prescribed to treat complaints of neuropathic pain.

28.     When later seen by Health Services on January 5, 2016, it was said that Spotted Elk "issue today appears more concerned with the absence of Lyrica than it does with his actual discomfort." Dockets 31 ¶ 27; 29-8. As reflected in his medical records, Spotted Elk's current issue . . . is virtually all related to the absence of Lyrica."

29.     Spotted Elk, on January 5, 2016, told Health Services that "the ruling was reversed" and "there is no record of him abusing the Lyrica." Dockets 31 ¶ 28; 29-8. According to Spotted Elk, "he does not feel that checking with DOC personnel will be required for useful or even allowed since, according to him, there is no record of same."

30.     In response thereto, "patient is informed the order for Gabapentin will remain in place." Dockets 31 ¶ 29; 29-8. Spotted Elk was specifically told that "no Lyrica will be order now or for that matter again until this provider has had an opportunity to discuss the issue with the provider who discontinued the Lyrica."

31.     Spotted Elk later reported to Health Services on January 6, 2016, "to see if Dr. Regier had made any changes to his medications." Dockets 31 ¶ 30; 29-35. When told that he had not, Spotted Elk stated that "he should have and that he has a lawsuit filed due to this."

32.     The record reflects that, when seen on January 6, 2016, "patient did not appear to be in any pain" and "was not in any acute distress." Dockets 31 ¶ 31; 29-35. Spotted Elk also "didn't complain of any pain at this time."

33.    Spotted Elk, on February 4, 2016, reported to sick call and informed Health Services

that "I have a civil rights lawsuit filed against Dr. Regier because he isn't doing his job and

doing what I need done." Dockets 31 ¶ 33; 29-41.

34.    On February 22, 2016, Spotted Elk again reported to Health Services complaining

that he was "being discriminated against due to being an inmate." Dockets 31 ¶ 34; 29-36.

He was "wondering why his Lyrica has not been order as the Gabapentin doesn't help, at

least the doses that he is on."

35.    It was explained to Spotted Elk that "just because he asked for something does not

mean the provider is going to order it." Dockets 31 ¶ 34; 29-36. He "took offense" to this

and again started complaining that Health Services were discriminating against him because

he is an inmate."

36.    Spotted Elk later reported to Health Services on February 25, 2016, and stated "I am

here to talk about the problems that I have been having and the treatment that I have been

refused." Dockets 31 ¶ 35; 29-54. He again insisted that he "wants his Lyrica back" or,

despite his previous complaint of constipation, "his Gabapentin increased."

37.    In response thereto, it was "noted that he is not following the regimen currently

prescribed as he has not ordered Tylenol in 2016." Dockets 31 ¶ 35; 29-54. Spotted Elk,

therefore, was "encouraged to take the meds that were order as they are prescribed for six

weeks and if they do not work, to come back to sick call and discuss it."

38.    Spotted Elk returned to Health Services on February 26, 2016 "again complaining

about wanting to get his Lyrica back." Dockets 31 ¶ 36; 29-37. Staff again undertook again

to "review the reason the provider had stopped his Lyrica and that at this time the providers were not willing to reorder it."

39.     Health Services, on that date, also attempted to "reeducate him on the fact that he had to show that he was compliant with what they prescribed for him before they would consider changing it." Dockets 31 ¶ 37; 29-37. Spotted Elk was told that staff had "checked his medication sheet and he had missed eleven doses for the month of February alone."

40.     In response thereto, Spotted Elk indicated that he "had been taking it every time since he signed the medication contract." Dockets 31 ¶ 38; 29-37. A review of his medical records indicates that Spotted Elk, on February 11, 2016, signed a "Medication Compliance Agreement and Notice" regarding the use of Gabapentin. Dockets 31 ¶ 38; 29-39.

41.     Health Services informed Spotted Elk "this was good but that the providers were going to need more than a two week timeframe to say that the medication wasn't working and that the dose either needed to be increased or changed Dockets 31 ¶ 38; 29-37.

42.     On March 3, 2016, Health Services again undertook to advise Spotted Elk that "right now they [providers] are not going to order his Lyrica at this time due to his previous misuse." Dockets 31 ¶ 39; 29-54. Spotted Elk responded by stating "well, I guess that makes my case a more solid one against the doctor."

43.     When later seen by Health Services on March 24, 2016, Spotted Elk was again complaining of pain but he "refuses to use the Tylenol and Triamcinolone as he states it does not help." Dockets 31 ¶ 40; 29-38. Health Services "offered to obtain more medication which patient refuses." He was therefore "educated on fact that providers typically do not see people when noncompliant with their recommended therapy."

44. Although "verbalizing understanding," Spotted Elk told Health Services that "I know why they work here, they couldn't make it in a real hospital." Dockets 31 ¶ 40; 29-38. Staff again attempted to educate him "on need to use the prescribed therapy and then approach the provider regarding ineffectiveness." Spotted Elk was advised that "referral will be made when inmate becomes compliant with prescribed therapy."

45. Spotted Elk reported to Health Services on March 25, 2016, insisting that he "needed to see the provider so that he could get his Lyrica back as stated per the medical contract he signed." Dockets 31 ¶ 42; 29-40. According to Spotted Elk, he "has been compliant with his medication so he can now get his medication (Lyrica) back."

46. It was explained to Spotted Elk that "there was nothing in the contract that stated he would get the medication he wanted just because he took the medication as prescribed and it didn't work." Dockets 31 ¶ 42; 29-40. Spotted Elk was again told that "the next step in the process would be for him to attend sick call and report that he has been taking his medication as ordered and he is still having the same pain and request to have the provider reassess his case."

47. When later seen by Health Services on August 22, 2016 for "evaluation of chronic ongoing back pain," Spotted Elk "states no improvement with previous use of Lodine and Ibuprofen." Dockets 31 ¶ 50; 29-27. In response thereto, the provider elected to "discontinue Lodine and start Meloxicam 7.5 mg one tablet by mouth twice a day when necessary."

48. Health Services also elected, on August 22, 2016, to again "refer to neurosurgery." Dockets 31 ¶ 51; 29-27. Arrangements were thus made for a "follow up appointment with orthopedic surgeon, Dr. Alvine, re: back pain." Dockets 31 ¶ 51; 29-28.

49.     Spotted Elk, on said date, again informed Health Services that he had "filed a lawsuit against several of the providers here." Dockets 31 ¶ 52; 29-27. He attempted to question medical staff "how to fill out his legal paperwork." Staff, however, advised Spotted Elk that they "could not assist him with filing out his legal paperwork and he should notify his Unit Manager of his need of legal assistance."

50.     The record reflects that, when seen by Dr. Alvine on September 26, 2016, Spotted Elk was "already on Meloxicam and Tylenol for pain." Dockets 31 ¶ 56; 29-33. Spotted Elk "reminded" Dr. Alvine that he had been on Lyrica but was "off Lyrica now for whatever reason."

51.     Spotted Elk neglected to tell Dr. Alvine that his prescription for Lyrica had been discontinued due to his having abused/misused that medication. Docket 31 ¶ 56. It is therefore recommended by Dr. Alvine to "start him [Spotted Elk] back on Lyrica 75 mg D.I.P. Dockets 31 ¶ 56; 29-33.

52.     In response to said recommendation, Health Services at the SDSP, on September 26, 2016, "spoke .with nurse in Dr. Alvine's office and informed her patient will not be prescribed Lyrica or Gabapentin d/t misuse." Dockets 31 ¶ 57; 29-34. The record reflects that Dr. Alvine's nurse "states understanding and will notify Dr. Alvine."

53.     Health Services was further advised, on said date, that while CORE Orthopedics "do recommend McKenzie back program with Craig Riley if possible . . . if there is a PT program inside the prison, that is fine also." Dockets 31 ¶ 58; 29-34.

54.     Spotted Elk thereafter reported to Health Services on September 27, 2016 indicating that he "would like to know why he was taken off his Lyrica." Dockets 31 ¶ 59; 29-43. He again maintained that "there is no write up for misuse of this medication."

55.     In response to his complaint that Dr. Alvine had "recommended to start Lyrica to help me with all his nerve pain," Health Services attempted to explain to Spotted Elk that "outside providers' orders are recommendations that are reviewed by our [Health Services] providers, then our providers write orders." Dockets 31 ¶ 60; 29-44. He was told that "provider states due to past write ups/informationals, no Lyrica will be prescribed at this time."

56.     At that point, "patient begins arguing with . . . nurse . . . stating 'I should be prescribed Lyrica because those write ups were dropped.' " Dockets 31 ¶ 60; 29-44. The record, however, reflects that Health Services was made aware of an incident on August 23, 2016 where, once again, "patient was found guilty of misuse of medications." Dockets 31 ¶ 61; 29-44.

57.     As indicated in a Disciplinary Report dated August 23, 2016, Spotted Elk "took the meds out of the cuff port and bent over so he could not be viewed with the medications." Dockets 31 ¶ 62; 29-47. After several seconds, the correctional officer "asked what he was doing with his medications out of the sight of myself." Spotted Elk "took several more seconds and explained that he was just stirring the medication."

58.     Spotted Elk finally stood up and "put his med cup to his mouth." Dockets 31 ¶ 63; 29-47. When Spotted Elk placed the med cup on the cuff port, it appeared that it "still had

some juice in it but appeared to be clear of medication residue that typically goes with taking this crushed medication."

59.    On September 30, 2016, Spotted Elk again returned to Health Services stating that he "wanted to address that there is no write up that he was found guilty of in his disciplinary history." Dockets 31 ¶ 64; 29- 45.According to Spotted Elk, he had "never been found in possession of any misuse of medication." In response thereto, Health Services informed him that "there are several write ups in his chart that indicate otherwise."

60.    When seen by Health Services on January 9, 2017, Spotted Elk was again insisting that he "would like to be placed back on Lyrica." Dockets 31 ¶ 65; 29-48. According to Spotted Elk, he has "tried Meloxicam, Sulindac, and now Ibuprofen plus Tylenol without substantial control of his pain." Spotted Elk told Health Services that he was "frustrated" about not getting Lyrica.

61.    The record reflects that "lengthy discussions ensued wherein Spotted Elk "showed his documents about various hearings." Dockets 31 ¶ 66; 29-48. According to Spotted Elk, he was "not guilty on abuse of Lyrica in 2015" and he was "now interested in signing a Medicine Compliance Agreement again for it."

62.    Although previously indicating that "his write up was dismissed because he was not served it within seven days of getting it," Spotted Elk, for the first time, maintained that "his hearing on this was not guilty verdict." Dockets 31 ¶ 66; 29-10; 29-48. He did, however, "admit to not following nurse's directions concerning Gabapentin in April 2016." Dockets 31 ¶ 66; 29-48.

63. The entry/notation in his medical records dated February 21, 2017, reflects that Spotted Elk was "treated with multiple NSAIDS" including Tylenol, Lyrica and Gabapentin. Dockets 31 ¶ 67; 29-49. As indicated therein, there have been "several incidents" where he was alleged to be abusing his Lyrica and Gabapentin.

64. Spotted Elk, on February 21, 2017, informed Health Services that he had filed a lawsuit in regards to "mistreatment and not being provided these meds." Dockets 31 ¶ 68; 29-49. He had to be "continually redirected away from his legal case throughout the visit as he wanted to show me [provider] his legal filings and claims that he was falsely accused."

65. It was recommended by Health Services that Spotted Elk "continue his Tylenol and non-steroidal anti-inflammatories as previously prescribed and continue regular stretching." Dockets 31 ¶ 69; 29-49. He was further advised that provider would "request patient have repeat MRI of his lumbar spine." In addition thereto, the provider indicated that he would also "request EMG to see if this will help quantify the patient complaint and potentially guided treatment plan in the future." Dockets 31 ¶ 69; 29-49.

66. Said MRI was completed on March 22, 2017. When "compared to previous MRIs from September 1, 2015, it revealed that 'per radiology small central left paracentral disc protrusions at L3-4 and L4-5 have decreased in size since September 1, 2015 without significant spinal stenosis.' " Dockets 31 ¶ 70; 29-50. There were "no other significant findings per radiology."

67. The record reflects that Spotted Elk also underwent "EMGs and bilateral lower extremities and right upper extremity" on March 23, 2017." The results of said tests were "interpreted by neurology" and it was said that there was "no convincing electrophysicologic

evidence of a radiculopathy plexopathy or other monoeuropathy affecting the right upper or bilateral lower extremities." Dockets 31 ¶ 71; 29-50.

68.     Based on the results of these tests, the "plan" was to "continue conservative management with nonsteroidal anti-inflammatory." Dockets 31 ¶ 73; 29-50.

69.     Spotted Elk was later seen by Health Services on May 3, 2017, in connection with "left interior quadriceps pain/superior knee pain." According to Spotted Elk, he "banged his left distal quadriceps region on a metal bed while getting out of bed." Dockets 31 ¶ 74; 29-51. The record reflects that "no other problems reported today."

70.     Although reporting "no other problems" Spotted Elk, "at the end of his visit he asked me [provider] if there was something different he could try for his chronic back pain." Dockets 31 ¶ 74; 29-51. In response thereto, he and the provider "did talk about the use of Loxitane to manage chronic pain."

71.     Spotted Elk, however, maintained that "after taking the med only three times, he developed significant nightmares which he attributed to the medication." Dockets 31 ¶ 75; 29-51. The provider undertook to "review the side effects of medication with patient" and informed him that "nightmares occurring less than 1%." Spotted Elk, therefore, was "encouraged to again try the medication."

72.     When later seen on May 23, 2017, Spotted Elk "again asked about getting Lyrica." He was told, however, that he "could not have Lyrica as it is previously alleged that he abused it." Dockets 31 ¶ 76; 29-52.

73.     The provider, however, "did offer potentially to put him [Spotted Elk] on Cymbalta for chronic pain which is FDA approved for neuropathic pain." Dockets 31 ¶ 76; 29-52.

Spotted Elk "declined at this time." He "also declined today" when the provider "did offer him physical therapy."

74.    As reflected in the medical entry/notation dated June 20, 2017, "patient has tried multiple NSAIDS and Tylenol for back pain." Dockets 31 ¶ 77; 29-53. Spotted Elk, however, maintains that said medications "provide him absolutely no help." The provider, therefore, informed Spotted Elk that "we'll give him a trial of Cymbalta for his subjective chronic pain." He was instructed that he "may continue Tylenol and Ibuprofen as needed." Dockets 31 ¶ 77; 29-53.

**Other Forms of Treatment**

75.    In addition to the various alternative medications that were prescribed in response to his complaints of chronic pain, Health Services also made arrangements whereby Spotted Elk, on December 7, 2015, underwent x-rays of his lumbar spine. Dockets 31 ¶ 25; 29-13. As indicated in the report received from Avera Medical Group Radiology, "no fracture or subluxation is seen otherwise." Spotted Elk was diagnosed with a "L5 pars defect." *Id.*

76.    Spotted Elk, on December 7, 2015, also underwent hip x-rays in response to his complaints of pain which he "feels as if this pain comes from the way he compensates for his back pain." Dockets 31 ¶ 24; 29-12. The results of said x-rays revealed "no evidence of hip dysplasia or significant degenerative change." *Id.* According to the report, there was "no acute process."

77.    On January 19, 2016, Dr. Regier was contacted by Health Services and advised regarding "patients changed their mind about epidural" injection. Dockets 31 ¶ 32; 29-16.

An Authorization Request was thus submitted by Dr. Regier for Spotted Elk to undergo "epidural due to back pain." Dockets 31 ¶ 32; 29-15.

78.     That request was granted and an appointment was scheduled for "epidural block related to back pain." Dockets 31 ¶ 32; 29-16. The record reflects that Spotted Elk was thus seen at the hospital on February 9, 2016 for an "epidural injection at L3-4 today to see if this helps." Dockets 31 ¶ 32; 29-17; 29-18.

79.     When Spotted Elk reported that he was "failing conservative treatment," arrangements were made on April 25, 2016, to "schedule appointment with orthopedic spine specialist or neurosurgery" for "further potential treatment evaluation." Dockets 31 ¶ 43; 29-19; 29-20; 29-21. Said appointment was scheduled for June 2, 2016. Dockets 31 ¶ 43; 29-21.

80.     When examined by Dr. Gregory Alvine at CORE Orthopedics on June 2, 2016, Spotted Elk was diagnosed with what "looks to me [Dr. Alvine] like he has pars defect at L5." Dockets 31 ¶ 47; 29-23. He was said to have "good strength in his legs" and "flexion and extension are relatively pain free."

81.     Based on his diagnosis, Dr. Alvine indicated that he "would start with an L5 pars injection, continue Ibuprofen and Tylenol." It was again recommended that Spotted Elk start a home exercise program. Dockets 31 ¶ 47; 29-23. A review of his medical records reveals that Spotted Elk, on April 25, 2016, had previously been provided a "green theraband" to use for his alleged back pain. Dockets 31 ¶ 48; 29-20; 29-26. In addition thereto, arrangements have also been made by Health Services at the SDSP whereby Spotted Elk had

previously undergone physical therapy in connection with his complaints of back pain. Dockets 31 ¶ 48; 29-18.

82.     Pursuant to said recommendation, arrangements were made to transport Spotted Elk to the hospital on July 13, 2016 where he underwent a L5 pars injection. Dockets 31 ¶ 49; 29-24; 29-25.

83.     Subsequent thereto, arrangements were made, on August 23, 2016, to schedule a follow up appointment with Dr. Alvine "regarding back pain." Dockets 31 ¶ 51; 29-28. That appointment was scheduled for September 26, 2016. Dockets 31 ¶ 51; 29-33.

84.     Prior thereto, Spotted Elk, on or about August 24, 2016, underwent additional x-rays of his lumbar spine. Said tests revealed "no evidence of instability" and there was also "no abnormal vertebral body excursion on the section or extension views." Dockets 31 ¶ 53; 29-29. Spotted Elk was said to have "mild grade 1 anterolisthesis of L5 over S1 secondary to bilateral pars" and he was diagnosed with a "history of degenerative disc disease." Dockets 31 ¶ 53; 29-29; 29-30.

85.     When later seen by Dr. Alvine on September 26, 2016, Spotted Elk was diagnosed with degenerative disc signal at L3-L4 and L4-L5." Dockets 31 ¶ 54; 29-33. According to Dr. Alvine, "looking back at his MRI and x-rays, I do not think he does have a pars defect."

86.     Based on his physical examination of Spotted Elk, Dr. Alvine concluded that "I do not think there is a good surgical option here for his back pain." Dockets 31 ¶ 54; 29-33. Spotted Elk told Health Services that he was "told by him [Dr. Alvine] that usually they fuse the disc but that proved to be more harmful than helpful" and that "the best thing to do is to manage it." Dockets 31 ¶ 55; 29-45.

87.     According to Dr. Alvine's report, "a McKenzie back exercise program is where I would start with therapy." Dockets 31 ¶ 55; 29-33. As reflected in the record, "patient was told by outside provider that he was to maintain muscle buildup to strengthen his back." Dockets 31 ¶ 55; 29-45.

88.     When later seen by Health Services on February 21, 2017, Spotted Elk "states he has been doing daily stretching exercise which does seen to help a little." Dockets 31 ¶ 68; 29-49.

**Malingering**

89.     A review of the record reflects that Spotted Elk's case was said to be "Quite difficult." Dockets 31 ¶ 78; 29-49. According to the record, his "exams have been inconsistent" thereby "making it very difficult to determine etiology of symptoms and severity of symptoms."

90.     Although Spotted Elk "does have the MRI findings which could cause some problems with his back pain" the report from the outside provider indicates that "everything on his MRI scan looks much more severe on the left. However, his right pain and back pain is predominantly on the right." Dockets 31 ¶ 78; 29-18, 29-41. This, therefore, "leads to difficulty in explaining his right sided symptoms." Dockets 31 ¶ 78; 29-41.

91.     Moreover, Spotted Elk complained to Health Services that "pain increases with walking and ambulating" and that "it gets bad with walking." Dockets 31 ¶ 79; 29-27, 29-48. There are numerous instances, however, documented in his medical records where Spotted Elk was "observed ambulating" and "has no gait disturbance or imbalance." Dockets 31 ¶ 79; 29-8; 29-41; 29-49; 29-50.

92.     There are also numerous instances where Spotted Elk, when seen by Health Services, was "able to get up on the exam table independently with ease." Dockets 31 ¶ 80; 29-8; 29-27; 29-35. Although Spotted Elk complained of pain in the lower back with external rotation of the hips, the record reflects "no note of radiculopathy" and he was "able to extend bilateral lower extremities to 90°." Dockets 31 ¶ 80; 29-27.

93.     Spotted Elk, on numerous occasions, was found to have "full range of motion" along with "normal posture." Dockets 31 ¶ 81; 29-41; 29-52. It was said that "motion of the back appears to be relatively well preserved" and there was "no palpable muscle spasms in the paravertebral muscles." Dockets 31 ¶ 81; 29-8.

94.     When seen by Health Services on August 22, 2016, Spotted Elk "did report of considerable pain with climbing ladder to get in the top bunk." Health Services thus issued a "bottom bunk order." Dockets 31 ¶ 82; 29-27. Spotted Elk, however, although "living by himself for several days, was choosing to live on the top bunk of the cell he lived in currently." Dockets 31 ¶ 82; 29-45. The record reflects that he was "able to get into bed and out of the top bunk with no difficulties."

95.     According to his medical records, Spotted Elk displayed "significant drug seeking behavior." Dockets 31 ¶ 83; 29-49; 29-50. As reflected therein, Spotted Elk complained of "subjective chronic low back pain with no evidence of objective disability." Dockets 31 ¶ 83; 29-53. It was said that the "majority of his complaint is entirely subjective Dockets 31 ¶ 83; 29-52.

96.     Said diagnosis/findings was based, in part, on the result of the MRI that Spotted Elk underwent on March 27, 2017. Dockets 31 ¶ 73; 29-50. That test revealed that the "small

central left paracentral disc protrusions at L3-4 and L4-5 had decreased in size since September 1, 2015." There is no evidence of any significant spinal stenosis or other "significant findings per radiology."

97.     The results of the EMG that Spotted Elk underwent on March 23, 2017 were also, when interpreted by neurology, said to be "normal." Dockets 31 ¶ 71; 29-50. There was "no convincing electrophysicologic evidence of a radiculopathy plexopathy or other monoeuropathy affecting the right upper or bilateral lower extremities." According to results of the nerve conduction study, there was "also no evidence of a more defuse myogenic or large fiber neurogenic disorder." Dockets 31 ¶ 71; 29-50.

98.     The "assessment," therefore, was once again that Spotted Elk suffers from "low back pain with report of subjective chronic pain in paresthesias without significant objective findings." Dockets 31 ¶ 83; 29-50.

**Failure to Cooperate**

99.     Finally, a review of Spotted Elk's medical records reflects that "there have been several instances alleged that he was abusing his Lyrica and Gabapentin." Dockets 31 ¶ 84; 29-49; 29-50. As already indicated elsewhere herein, "these medications were discontinued due to alleged abuse." Dockets 31 ¶¶ 23, 57; 29-53.

100.    Once such incident occurred on April 15, 2016 when a correctional officer, when conducting med pass, "seen Inmate Spotted Elk cheek his medication." Dockets 31 ¶ 84; 29-42. Despite multiple directives, Spotted Elk "would not open his mouth" and would instead "clinch his teeth shut."

101.    As reflected in a Disciplinary Report dated April 15, 2016, "this is considered misuse

of medication Dockets 31 ¶ 84; 29-42. Spotted Elk later told staff that he was "trying to get

off the medication and did not want to even take them."

102.    Spotted Elk, was seen by Health Services on September 30, 2016, maintained that he

has "never been found in possession of any misuse of medication." In response thereto,

"patient is informed there are several write ups found in his chart that indicates otherwise."

Dockets 31 ¶ 64; 29-45.

103.    When later seen by Health Services on January 9, 2017, Spotted Elk "admits to not

following the nurses' directives concerning his Gabapentin in April of 2016." Dockets 31

¶ 66; 29-48.

104.    On August 23, 2016, another Discipline Report was filed wherein Spotted Elk was

again charged with abusing his medication. Dockets 31 ¶ 62; 29-47. Spotted Elk deliberately

"bent over so he could not be viewed with the medications." Although he "explained that he

was just stirring the medications," the Discipline Report states that the med cup "appeared

to be clear of medication residue that typically goes along with taking this crushed

medication."

105.    The record reflects that there is also an entry/notation in Spotted Elk's medical

records, dated February 26, 2016, indicating that Health Services "had checked his

medication sheet and he had missed eleven doses for the month of February alone." Dockets

31 ¶ 37; 29-37.

106.    Spotted Elk, when seen by Health Services on May 23, 2017, maintained that "the

nurses will not give him his Ibuprofen and Tylenol." Dockets 31 ¶ 85; 29-52. As noted,

however, in his medical records, Spotted Elk "cannot produce a single name or specific date or time when he alleges nursing/medical staff told him that he could not have his meds."

107.    Upon "further questioning," Spotted Elk admitted to the provider that he "has never reordered." Dockets 31 ¶ 85; 29-52. When the provider "explained to him the reorder process he is to follow to keep from running out of his meds," Spotted Elk maintained that he "shouldn't have to follow these policies."

108.    Spotted Elk was advised that "he is no different from any other patient here in the prison and he has to reorder his meds per policy." Dockets 31 ¶ 86; 29-52. The provider informed Spotted Elk that "there is nothing further I can do other than expect him to follow policy like everyone else."

109.    Health Services undertook to "advise patient if he took the medication sparingly and skipped doses frequently, he was not likely to have any beneficial effect." Dockets 31 ¶ 86; 29-51. As reflected in an entry/notation dated October 29, 2015, it is Defendant's belief that "when medication is abused and not taken as directed, it shows that patient does not need medication." Dockets 31 ¶ 86; 29-5.

110.    Defendant Adams is a licensed physician's assistant authorized to practice in the State of South Dakota since 2001. *See* Docket 36 ¶ 1.

111.    Defendant Adams has been employed with the South Dakota Department of Health as a "Medical Health Professional" since May 30, 2016. *See* Docket 36 ¶ 2.

112.    Defendant Adams only treated or otherwise had interaction with Spotted Elk for a brief period of time beginning in mid October 2015 through roughly the end of November 2015. *See* Docket 36 ¶ 3.

## LEGAL STANDARD

In considering a motion for summary judgment, the Court asks the question whether the record, when viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). "Once the motion for summary judgment is made and supported, it places an affirmative burden on the non-moving party to go beyond the pleadings and 'by affidavit or otherwise' designate 'specific facts showing that there is a genuine issue for trial.' " *Commercial Union Ins. Co. v. Schmidt*, 967 F.2d 270, 271 (8th Cir.1992) (quoting Fed.R.Civ.P. 56(e)). "A plaintiff's verified . . . Complaint is the equivalent of an affidavit for purposes of summary judgment, and a complaint signed and dated as true under penalty of perjury satisfies the requirements of a verified complaint." *Roberson v. Hayti Police Dep't*, 241 F.3d 992, 994–95 (8th Cir.2001) (citations omitted). If the allegations in the verified complaint consist of nothing more than conclusory allegations, however, they are insufficient to overcome a summary judgment motion. *See Roberson v. Bradshaw*, 198 F.3d 645, 647 (8th Cir.1999).

Prisoners who proceed pro se are entitled to the benefit of liberal construction at the pleading stage. *Quam v. Minnehaha Cty. Jail*, 821 F.2d 522, 522 (8th Cir. 1987). Nonetheless, the summary judgment standard set forth in Rule 56 of the Federal Rules of Civil Procedure remains applicable to prisoners proceeding pro se. *Id.* Courts must remain sensitive, however, "to the special problems faced by prisoners attempting to proceed pro se in vindicating their constitutional rights, and [the Eighth Circuit does] not approve summary dismissal of such pro se claims without regard for these special problems." *Nickens v. White*,

622 F.2d 967, 971 (8th Cir. 1980). "When dealing with summary judgment procedures the technical rigor is inappropriate where . . . uninformed prisoners are involved." *Ross v. Franzen*, 777 F.2d 1216, 1219 (7th Cir. 1985).

## DISCUSSION

Defendants, sued only in their individual capacity, contend that they are entitled to qualified immunity. Section 1983 provides a cause of action against any "person who, under the color of any statute, ordinance, regulation, custom, or usage, of any state" causes the deprivation of a right protected by federal law or the United States Constitution. 42 U.S.C. § 1983.

The doctrine of qualified immunity, however, generally shields " 'government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Smith v. City of Minneapolis*, 754 F.3d 541, 545 (8th Cir. 2014) (alteration omitted) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

To overcome a qualified immunity defense at the summary judgment stage, a plaintiff must show: "(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Howard v. Kan. City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009). The court may analyze these two factors in either order. *Hutson v. Walker*, 688 F.3d 477, 483 (8th Cir. 2012) (citing *Pearson v. Callahan*, 555 U.S. 223, 236

(2009)). But "[t]o deny the officers qualified immunity, [the court] must resolve both questions in [the plaintiff's] favor." *Hawkins v. Gage Cty.*, 759 F.3d 951, 956 (8th Cir. 2014).

Spotted Elk claims that defendants violated his constitutional rights under the Eighth Amendment by failing to provide him proper medical care. Dockets 1, 7. "[A] prison official who is deliberately indifferent to the medical needs of a prisoner violates the prisoner's constitutional rights." *Letterman v. Does*, 789 F.3d 856, 861 (8th Cir. 2015). To state an Eighth Amendment claim, plaintiffs must show "a substantial risk of serious harm to the victim," and "that the prison official was deliberately indifferent to that risk of harm . . . ." *Id.* at 861-62 (citing *Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006)).

"The deliberate indifference element has two components: an actor must 'know[ ] of and disregard[ ] an excessive risk to inmate health or safety.' " *Id.* at 862 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "Plaintiffs must first demonstrate that defendants knew of the substantial risk of serious harm to the victim." *Id.* (quoting *Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir. 1998)). To show this, a plaintiff does not need to show actual knowledge, the court "can infer knowledge if the risk was obvious." *Id.* It is enough to show that the defendant "had been exposed to information concerning the risk and thus 'must have known' about it." *Id.* (quoting *Farmer*, 511 U.S. at 842).

"The plaintiff must show the official 'knew that their conduct was inappropriate in light of' the risk to the prisoner." *Id.* (quoting *Krout v. Goemmer*, 583 F.3d 557, 567 (8th Cir. 2009)). "Knew" in this context means more than negligence and is "akin to the criminal rule of 'recklessness.' " *Id.* (quoting *Farmer*, 511 U.S. at 839-40). "Generally, the actor manifests deliberate indifference by 'intentionally denying or delaying access to medical

care, or intentionally interfering with treatment or medication that has been prescribed.' " *Id.* (quoting *Krout*, 583 F.3d at 567).

With regard to the first element of a deliberate indifference claim, the court will assume that Spotted Elk's need for pain medication is sufficiently serious as Spotted Elk's back problems are well documented and defendants have persistently prescribed medication to alleviate Spotted Elk's pain. The second deliberate indifference element is subjective and requires Spotted Elk to present evidence which supports a finding that defendants "acted with sufficiently culpable state of mind, namely, that they actually knew of, but deliberately disregarded [his] medical needs." *Krout*, 583 F.3d at 567. Again, the fact that defendants persistently prescribed medication and repeatedly referred Spotted Elk to outside specialists demonstrates that defendants actually knew of Spotted Elk's medical needs.

There is no evidence that defendants disregarded Spotted Elk's medical needs. Spotted Elk claims that defendants completely denied him medication. Docket 7 at 4. The record, however, is replete with adjustments and active management of Spotted Elk's pain. *See* Docket 31. Spotted Elk received two epidurals. Dockets 31 ¶¶ 16, 32; 29-15; 29-16; 29-59. Spotted Elk was prescribed several different medications, including Ibuprofen, Tylenol, Gabapentin, Neurontin, Lodine, Meloxicam, Loxitane, and Cymbalta, to address his pain. Dockets 31 ¶¶ 20-74; 29-5; 29-8; 29-19; 29-27; 29-52. Furthermore, Spotted Elk was frequently approved to see outside medical providers to treat his pain. Dockets 31 ¶¶ 16, 32, 46, 54; 29-1; 29-15; 29-16; 29-17; 29-18; 29-27; 29-30; 29-31; 29-32; 29-33.

The fact that defendants denied Spotted Elk his preferred drug Lyrica does not constitute deliberate indifference. Spotted Elk has no constitutional right to a particular

course of treatment, and claims based solely on a disagreement with the course of treatment do not rise to the level of a constitutional violation. *See Meuir v. Greene County Jail Employees*, 487 F.3d 1115, 1118-19 (8th Cir. 2007). Spotted Elk raises no issue of fact that defendants' denial of Lyrica goes beyond a mere disagreement with the course of treatment. Thus, Spotted Elk fails to demonstrate a constitutional violation necessary to overcome qualified immunity. As such, defendants are entitled to qualified immunity on Spotted Elk's claim of deliberate indifference.

### CONCLUSION

Defendants move for summary judgment on Spotted Elk's deliberate indifference claim. They presented evidence, including Spotted Elk's extensive medical records, in support of their claim. The court accepted defendants' statement of material facts as true, because Spotted Elk did not respond to their motion. Even viewing these facts in the light most favorable to Spotted Elk, defendants are entitled to judgment in their favor. Therefore, it is ORDERED

1. Defendant's motion for summary judgment (Docket 28) is granted. Summary judgment is entered in favor of defendants.

2. Spotted Elk's motions to appoint counsel (Dockets 38 & 40) are denied as moot.

Dated this 23rd day of March, 2018.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK

BY: _____
Deputy